**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-2(c)

**Greenbaum, Rowe, Smith & Davis LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Attorneys for the Debtor
David L. Bruck, Esq.

| | |
|---|---|
| In re: | Chapter 11 Proceeding |
| **MUNIRE FURNITURE COMPANY, INC.** | **Case No. 14-29229 (CMG)** |
| Debtor. | |

**CERTIFICATION OF STEVEN J. FLEMING IN SUPPORT OF DEBTOR'S MOTION TO AMEND THE SALE ORDER FILED BY THE DEBTOR ON DECEMBER 22, 2014 AND TO RESPOND TO THE FALSE STATEMENTS AND RUMORS BEING SPREAD BY BEACONHOUSE CAPITAL**

Steven J. Fleming, MBA, being duly sworn, state as follows:

1. I am a Principal at PricewaterhouseCoopers LLP and am currently serving as the Chief Restructuring Officer (the "CRO") of Munire Furniture Company, Inc., the within Debtor ("Munire" or "Debtor"). I have worked as a financial advisor at PwC for approximately 17 years. I have substantial knowledge and experience as a financial advisor and in providing investment banking services to large and mid-sized companies and in assisting companies with analyzing their operations and evaluating restructuring alternatives. I make the within Certification in support of the Motion to Amend the Sale Order filed by the Debtor on December 22, 2014 and to respond to the false statements and rumors being spread by Beaconhouse Capital ("BH").

2. BH threatens to disrupt the sale process.

3. I introduced BH to the Munire case as an opportunity shortly after having been appointed as the CRO on September 19, 2014. I had known BH from other transactions.

4. BH was given full access to the Debtor's books and records and participated at my invitation with calls to key customers. BH spent considerable time at the Debtor's premises in carrying out due diligence.

5. Despite BH's expressed interest in the assets and the head start in due diligence, its proposal to acquire the Debtor's assets has always been lower than others.

6. BH did not submit a qualifying bid in advance of the Bid Deadline and never submitted a marked up APA as required of all bidders.

7. After deciding not to submit a qualified bid, BH sought to participate in the deal through Heritage Baby Products, LLC ("Heritage"). I was informed by Heritage that the terms set forth by BH were onerous, and included a significant management fee, as well as the provision that Munir Hussain remain as CEO. As a result, Heritage did not accept the term sheet put forward by BH.

8. After Heritage had terminated the APA, I called BH and alerted it to the opportunity to bid. I called other bidders as well. BH submitted a bid for the assets but the bid was still lower than the offer of a third party bidder and I so advised BH. The offer of BH expired by its terms on Friday, December 19, 2014. I have not received a further offer nor has BH sent me a marked up APA as required.

9. I continued communication with BH over the past weekend. In those calls I explained that their bid which had expired was still inferior to other bids that the debtor was considering and again requested that it provide any modified bid in writing. None was received. I made it clear to BH that time was of the essence and that if it was to submit a revised bid that I had to have it by Sunday evening so that I could discuss with the Director and then come to a resolution first thing on Monday morning. Despite this no further communication was received from BH other than the request for cash flow data, which as it turns out, was used in an analysis seemingly prepared to mislead the Committee.

10. I have been advised by counsel to the Committee that BH has sent to Committee counsel a memo in which it sets forth misleading information regarding the merits of its bid in an effort to disrupt the sale process. So that I am clear, the offer of BH while cosmetically economically superior to other bids was in reality inferior because of the proposed working capital peg and valuation of a note at face value, which in my evaluation had little to no value. I discussed these flaws in the BH bid with BH repeatedly as well as with the Board of Director of the debtor. Additionally, BH sent the UCC professionals a misleading analysis that shows the Debtor is cash positive through December 12, 2014. This analysis fails to account for accrued administrative expenses, which are higher than the cumulative cash generated through December 12, 2014, which indicates that the Debtor is burning, not generating cash. In fact, the Debtor's MOR for the month of November shows that net cash flow for the month was ($867,339.17). This

figure excludes accrued professional fees, which on a combined basis, average approximately $100,000.00 per week. Moreover, the cash collections through December 12th include the proceeds from the sale of slow and obsolete inventory, which is non-recurring, and would not be available to fund operations on a go-forward basis.

11. I have recently come into evidence that BH has violated the covenants of the NDA which it signed with the Debtor prior to being given access to the confidential information contained in the debtor's books and records. Despite the covenants in the NDA, BH held private calls and meetings with Munir Hussain, the debtor's founder. Upon learning of this breach I contacted Saquib Toor of BH and cautioned him.

12. The tale goes on. Within a few days of meeting with Saquib Toor at Mr. Toor's home, Munir Hussain advised Heritage that he would not enter into an employment agreement with Heritage. That turn of events we are told brought about the delivery of the Notice of Termination of the APA by Heritage. Whether the reason for the termination was as told to the debtor by Heritage that Heritage could not enter into an employment agreement with Mr. Hussain and was terminating under the key employee condition or for some other reason, the debtor does not know; however since the matter will be litigated if the sale to Heritage does not close I do not want to comment further. Needless to say, BH has been involved in damaging the debtor's estate the extent of which will be litigated should the transaction with Heritage not be concluded.

13. Despite being informed that its bid was inferior to at least three other bids being considered by the debtor, BH failed to submit a revised bid to the Debtor and its prior bid had expired. As of this writing, the Debtor has neither a written bid from BH nor a marked up APA.

14. This is not the first time that BH has attempted to interfere with the Debtor's sale process. After failing to submit a qualifying bid by the Bid Deadline so as to participate in an auction, BH instead sought to participate in the Heritage deal seeking a substantial management fee. After failing to reach an agreement with Heritage, BH then sought to make a deal with Mr. Hussain in an effort to derail the Heritage deal. Within hours, the employees of the debtor were bombarded with stories that Mr. Hussain was going to launch a new business funded by BH and would steal the debtor's business with its prime customers.

15. Finally at this late hour, BH has communicated directly with Committee counsel and has provided committee counsel with misleading information in an effort once again to derail the process and approval of the Heritage proposal. BH has had ample opportunities to improve its bid, but has chosen not to do so. Additionally, BH has been provided with editable versions of the Heritage APA and schedules, yet has not submitted a markup of the Heritage APA, or anything other than a non-binding LOI, despite being informed by me that others third parties have done so, and that the Debtor would need to evaluate all of the terms and conditions in order to appropriately evaluate a bid.

16. Should BH be successful in derailing the approval of the sale to Heritage, the estate would bear 100% of the risk of operating the business and potentially getting to another going-concern closing in 2015. Should the business prove to be unable to survive such a deal, a new venture with Munir Hussain, backed by BH, would have one less competitor to compete against.

17. The debtor views the closing of the sale to heritage as the best opportunity to maximize value for the estate. The prospect of continuing the business so that another sale process can be launched with the incumbent delays and uncertainties is daunting and full of risk to the estate. While the road to a closing with Heritage has not been without twists and turns, it is here now and the economics are not drastically different to the estate than that originally proposed. The customers and vendors are at their wits end. Now is the time to order for the spring. With the uncertainty of the Debtor's survival, it is unknown whether the business can survive another three weeks. Moreover the administrative expense of operating the debtor will continue and will consume any perceived advantage to moving to a new buyer with all the uncertainties that a new buyer presents.

18. I view the anticipated objection by BH at the Court Call to be nothing short of malicious interference with the Debtor's sale process.

-7-

I hereby certify that the statements set forth herein are true and that if any of the statements are willfully false, I am subject to punishment.

_____
Steven J. Fleming

Dated:  December 23, 2014

3122228.1